[Cite as *In re K.G.*, 2014-Ohio-3461.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### Nos. 100782 and 100843

---

# IN RE:   K.G.

# [Appeal by R.G., Father, and C.C.D.C.F.S.]

---

## JUDGMENT:
## REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 12920735

**BEFORE:**   McCormack, J., Kilbane, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**   August 11, 2014

**ATTORNEYS FOR APPELLANTS**

**For C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

Michelle A. Myers
Assistant County Prosecutor
3955 Euclid Ave., Room 305E
Cleveland, OH   44115

**For R.G.**

Britta M. Barthol
P.O. Box 218
Northfield, OH 44067

Michael B. Telep
4438 Pearl Road
Cleveland, OH 44109


**ALSO LISTED:**

**Guardian Ad Litem**

Tyrone C. Fazio
1370 Ontario Street
The Standard Building, Suite 1
Cleveland, OH 44113

**Attorney for Mother**

Vickie L. Jones
P.O. Box 110771
Cleveland, OH 44111

**Attorney for Child**

William T. Beck
2035 Crocker Road
Suite 104
Westlake, OH 44145

TIM McCORMACK, J.:

{¶1} In this consolidated appeal, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency") and R.G. ("the father") appeal from the judgment of the juvenile court approving and adopting a magistrate's decision that committed R.G.'s son, K.G., to the temporary custody of the agency and ordered the child's therapist be replaced.

{¶2} For the reasons that follow, we reverse the decision of the juvenile court.

**Procedural and Substantive History**

{¶3} On December 18, 2012, the guardian ad litem for K.G. filed a complaint alleging the child to be abused and dependent and requested a disposition of temporary custody to CCDCFS.[1] The complaint was based on several incidents, including a drug raid at the father's home and an incident from May 2012 in which the father instructed K.G. to get out of a car being driven by his mother. According to the complaint, the father told K.G. to get out of the car and run away from his mother; the child jumped out of the car into traffic and ran; and the father called the police to pick up his son.

---

[1] Previously, K.G. had been living with his father under a shared-parenting agreement and having visitation with his mother. After a police raid on the father's home in May 2012, K.G.'s mother commenced a private custody action in which she requested custody of the child. In September 2012, the court denied the mother's motion for custody and committed K.G. to the emergency custody of the agency, over the objections of the agency and the father.

**{¶4}** The complaint also included the mother's conviction for child endangering in 2006, of which K.G. was the victim. The complaint stated that K.G. did not want to live with his mother because of her history of abusing him.

**{¶5}** At the hearing on the complaint and motion for pre-dispositional temporary custody on December 21, 2012, the agency claimed there was new information or evidence regarding the child jumping out of the car. The magistrate, however, stated there was no new information, did not accept any evidence, and stated that a prior emergency custody order had already been issued on the matter in September 2012, citing res judicata. She then committed the child to the temporary care and custody of the agency. At this hearing, the magistrate also reduced the father's visitation with the child, requiring CCDCFS to provide "equal visitation" for the mother and the father. Both the agency and the father opposed the magistrate's position.

**{¶6}** Following various procedural matters and continuances, an adjudicatory hearing was held on May 8, 2013. Present for the hearing were the father and his counsel, the mother and her counsel, the guardian ad litem, the child's counsel, and the agency's counsel. At the hearing, the parties stipulated to an amended complaint and the child was adjudicated abused and dependent. The matter was continued for disposition.

**{¶7}** The dispositional hearing was held on September 10, 2013, almost one year after K.G. was originally committed to the temporary emergency custody of CCDCFS. Prior to commencement of the hearing, the guardian ad litem for the child orally moved to

amend the dispositional request from temporary custody to CCDCFS to legal custody to the father with protective supervision to CCDCFS. The mother objected to this amendment, and the court denied the motion.

{¶8} During the hearing, the guardian ad litem presented two witnesses: (1) Detective Robert Sauterer of the Cleveland Police Department, who testified as to his involvement with the raid on the father's home in May 2012; and (2) Dr. Randall Baenen, a psychologist in private practice, who had been contracted by the Juvenile Court Diagnostic Clinic to complete a custody evaluation for the family in this case. CCDCFS presented three witnesses on the agency's behalf: (1) Laurel Green, K.G.'s therapist; (2) Katherine Biddle, the assistant vice president of clinical services at Beechbrook, who oversees all trauma-based therapies at Beechbrook; and (3) Arvella Fike, the ongoing CCDCFS worker for the family. Neither the mother nor the father presented evidence or testimony at the hearing.

{¶9} At the end of the hearing, the father, CCDCFS, the guardian ad litem, and the child's attorney all requested that the court return K.G. to the custody of his father with protective supervision to CCDCFS. The magistrate held her decision in abeyance, pending a second in camera interview with K.G.

{¶10} On October 16, 2013, the magistrate ordered K.G. into the temporary custody of CCDCFS and further ordered that the child's therapist, Laurel Green, be replaced. Thereafter, on October 21, 2013, the agency filed a motion for findings of fact

and conclusions of law, and on October 30, 2013, the father filed objections to the magistrate's decision. On November 1, 2013, CCDCFS filed a motion for reconsideration of the magistrate's order removing the child's therapist, which was denied. The trial court adopted the magistrate's decision granting temporary custody of K.G. to the agency on November 6, 2013. And on November 15, 2013, in a second judgment entry, the court overruled the father's objections and again ordered the removal of K.G.'s therapist and ordered K.G. into the temporary care of the agency. On November 21, 2013, the agency filed objections to the magistrate's decision, which were overruled by the trial court.

{¶11} On December 12, 2013, CCDCFS appealed to this court. On December 26, 2013, K.G.'s father filed his appeal pro se. The father was appointed counsel, and the two appeals were consolidated. There is no party opposing the consolidated appeals. Both appellants appeal the decision of the trial court to return K.G. to the agency's temporary custody and to replace K.G.'s therapist. They request that the order of disposition be changed to legal custody to the father with protective supervision.

## Assignments of Error

{¶12} In its brief, CCDCFS contends that the trial court's order granting temporary custody to the agency was contrary to law and against the manifest weight of the evidence. CCDCFS also contends that the trial court's decision to remove the child's

therapist was a violation of the doctrine of separation of powers and against the manifest weight of the evidence.

{¶13} In a similar argument, the father contends that the trial court erred when it overruled his objections to the magistrate's decision. He also claims that the decision to remove the child's therapist and the decision to grant temporary custody of the child to the agency were against the manifest weight of the evidence.

{¶14} Following a thorough review of the record, we find that the trial court's order granting temporary custody to CCDCFS and removing the child's therapist was against the manifest weight of the evidence.

## Analysis

{¶15} As an initial matter, we review the magistrate's December 21, 2012 order of pre-dispositional temporary custody of K.G. to the agency. On this date, the magistrate did not hold a hearing and did not allow the parties to present evidence, stating that a prior emergency custody order had already been issued on the matter and is "res judicata."

{¶16} At the commencement of the hearing, the magistrate noted that there is a prior emergency custody order in place and she inquired of the parties' positions. In response, the mother indicated that she was in agreement with pre-dispositional temporary custody, and the guardian ad litem stated that she was not aware of any changes in facts or circumstances to the allegations in the original complaint. Both the father and the

agency objected to the emergency custody, noting new facts that are pertinent to custody and believed they should be heard by the court.

{¶17} The father's counsel stated that he believed there were additional facts concerning his client's criminal matter that may provide a better understanding of the case. He stated that he had learned of new evidence going to the facts alleged in the complaint "that would indicate that the facts alleged at that time may not be accurate or complete." In opposing emergency custody, the agency also provided that the new social worker had gained new information that "would be important for the court to know."[2] While acknowledging that the allegations were the same, the agency noted that there were new facts concerning whether there was a reason for K.G. to be in the agency's custody. Despite this new evidence and the apparent need for a hearing, the magistrate found "nothing has changed," cited res judicata, and granted emergency custody to the agency without holding a hearing.

{¶18} We have held that principles of res judicata do not apply to decisions in dispositional hearings because the court retains continuing jurisdiction. *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 24; *In re Ament*, 142 Ohio App.3d 302, 310, 755 N.E.2d 448 (12th Dist.2001). Even where a court has made a dispositional order, under R.C. 2151.353(E)(1), the court retains jurisdiction over the child until the child reaches the age of 18 years, with certain limited exceptions. *Id.* Because of this

---

[2]During this hearing, the prosecutor reminded the magistrate that the ongoing social worker, Arvella Fike, was assigned to this case after the initial emergency custody hearing in September.

continuing jurisdiction, res judicata will not prohibit the court from revisiting issues that are relevant to a motion for custody — legal or permanent — even if the same or similar issues may have been considered in a prior action falling within the purview of R.C. Chapter 2151. *In re M.N.*, 6th Dist. Ottawa Nos. OT-12-002, OT-12-003, OT-12-004, 2013-Ohio-836, ¶ 28; *In re Vaughn*, 4th Dist. Adams No. 00CA692, 2000 Ohio App. LEXIS 5938, *19 (Dec. 6, 2000); *In re Burkhart*, 12th Dist. Butler No. CA90-07-146, 1991 Ohio App. LEXIS 3937, * 11 (Aug. 19, 1991).

{¶19} Likewise, res judicata will not apply to a juvenile court's order placing a child in pre-dispositional emergency care and custody of CCDCFS. R.C. 2151.33, which governs the procedures with respect to the temporary care and custody of children, provides that "[f]or good cause shown, any court order that is issued pursuant to this section may be reviewed by the court at any time upon motion of any party to the action or upon the motion of the court." R.C. 2151.33(G). As such, under this section, the court retains continuing jurisdiction over the child and can revisit issues that may be similar to issues previously addressed.

{¶20} The magistrate's refusal to hear evidence regarding the alleged new information gained from the new social worker's investigation was therefore improper, especially given the fact that both the agency and the father claimed knowledge of new facts that could change the allegations of the complaint or obviate the need for the agency's custody of K.G. The magistrate's pronouncement that "nothing has changed"

was premature. Juvenile courts must consider all relevant evidence in order to determine a child's future and what is in the child's best interest, and we find the magistrate erred in not allowing the parties to present evidence to that effect.

{¶21} We now turn to the trial court's order committing K.G. to the temporary custody of CCDCFS and replacing K.G.'s therapist. The essence of the agency's and the father's argument on appeal is that this decision is not consistent with the facts and evidence presented. We agree.

{¶22} Although a trial court has discretion in custody proceedings, the record must contain sufficient factual evidence to support the court's findings. *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 6, citing *In re Schwendeman*, 4th Dist. Washington Nos. 05CA18, 05CA25, 2006-Ohio-636, ¶ 19. We will not reverse a judgment as being against the manifest weight of the evidence when the record contains some competent, credible evidence going to all the essential elements of the case. *Id.*, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶23} Here, the record of the dispositional hearing demonstrates that the evidence did not support a disposition of temporary custody to the agency as being in K.G.'s best interest. Rather, the overwhelming evidence supported legal custody to the father with protective supervision. The strongest support for this position is the guardian ad litem's

motion to amend her initial dispositional request from temporary custody to CCDCFS to legal custody to the father with protective supervision to CCDCFS.

{¶24} During the dispositional hearing, five witnesses testified. Detective Robert Sauterer of the Cleveland Police Department testified as to his involvement with the raid on the father's home in May 2012, which resulted in the father being arrested for selling marijuana in his home. Detective Sauterer stated that K.G. was present in the home at the time of the raid, but with the cooperation of his father, police were able to call K.G. and have him exit the home prior to the police entering the premises. Detective Sauterer further stated that he did not call CCDCFS because he did not believe K.G. to be in danger. In addition, the detective testified that he found a "very, very small amount" of marijuana in the father's home during a second search in February 2013, equivalent to a misdemeanor offense; however, no new charges were filed.

{¶25} Dr. Randall Baenen, a psychologist in private practice, had been contracted by the Juvenile Court Diagnostic Clinic to complete a custody evaluation for the family in this case. He testified that although he initially felt as though K.G. should remain in the custody of CCDCFS, his opinion changed after receiving more information and conducting the custody evaluation.

{¶26} Dr. Baenen interviewed the father, the mother, and K.G., and he witnessed an interaction between K.G. and his mother. He performed psychological tests, obtained observational information, and reviewed a previous custody evaluation completed in

2010. He spoke with the guardian ad litem and K.G.'s therapist. Dr. Baenen did not complete an interactional interview between the father and K.G. due to the logistics involved with the visitation schedule; however, he testified that there was no concern about the quality of the interactions between K.G. and his father.

{¶27} Dr. Baenen testified that K.G. has a "problematic relationship" with his mother "who acknowledges that she struggled early on in their relationship and physically and emotionally mistreated him." He further testified that this relationship has caused "significant complexions" for K.G. and his mother. Dr. Baenen testified that K.G. is uncomfortable with the prospects of living with his mother or having unsupervised visits with her. He also testified that after witnessing an interaction between K.G. and his mother, he determined that they were "not well attuned" to each other and "off balance with each other," which raised concerns should K.G. be assigned to his mother's care.

{¶28} With respect to the father, however, Dr. Baenen testified that K.G. expressed comfort with his father and there is a "connection" between the two of them. Dr. Baenen stated that K.G. "was very clear with me" in advising that he wished to live with his father. While Dr. Baenen expressed concerns for the father's criminal history, he stated that K.G. feels insecure in his current foster care and Dr. Baenen believes that, based on his conversations with K.G. and K.G.'s therapist, K.G. will regress if he stays in foster care and does not live with his father. Dr. Baenen stated that K.G. living with his father "is certainly the best way to protect against risks" and he has no concerns that the

father would mistreat K.G. Dr. Baenen therefore concluded that with the appropriate safeguards in place by CCDCFS, K.G. would best be served by returning to his father's care; and thus, returning custody of K.G. to the father, with an order of protective supervision, would be in the best interest of the child.

{¶29} Laurel Green, a licensed social worker and therapist employed by Beechbrook, had been K.G.'s counselor since October 2012, when he was referred to her for trauma-focused cognitive behavior therapy due to a diagnosis of post-traumatic stress disorder from previous abuse. She had been meeting with him weekly and working to address the trauma he suffered from the abuse by his mother. K.G. was in foster care when he was referred to Ms. Green.

{¶30} Ms. Green testified that she initially addressed various symptoms K.G. was having, such as nightmares, inability to sleep, and scratching on his head where he had a mark from previous abuse. She testified however that K.G.'s anxiety "has increased tremendously" since being in foster care. She therefore has had to change some of the initial objectives to address the anxiety K.G. was experiencing due to the lack of a stable home. Ms. Green testified that while K.G. felt safe in his current placement, he has repeatedly asked her when he could return to his father. She stated that he had become increasingly distracted and anxious about when he would be able to return to his father and, as a result, this anxiety has made it difficult to treat K.G. for the abuse he suffered from his mother.

**{¶31}** Ms. Green testified that she has had therapy sessions with K.G.'s father as well, in order to include the father in the trauma-based cognitive therapy and because K.G. expressed that he feels most comfortable with his father. She stated that K.G.'s mother is not involved in these sessions because K.G. is still fearful of his mother.

**{¶32}** Ms. Green stated that K.G. was unproductive both in his therapy sessions and during school, and she was concerned that he would continue to regress. She indicated that K.G. is 13 years old, yet he reads only at the second-grade level, and she believes the trauma K.G. suffered is a contributing factor to his academic delays.[3] She testified that it would be difficult for K.G. to progress in his therapy and begin to heal his relationship with his mother if he remained in foster care and away from his father. She also stated that K.G.'s current home environment is temporary and K.G. knows that. Ms. Green stated that K.G.'s foster mother had packed up his bags the morning of the hearing in preparation for him to go home to his father, which further created a situation in which K.G. felt insecure in his foster care placement. She concluded, therefore, that in her opinion, K.G.'s best interest would be served by continuing with his therapy and returning to his father's custody.

**{¶33}** On cross-examination, Ms. Green was questioned about her emotions during her testimony. She testified that she has been frustrated by the process and K.G.'s

---

[3] K.G.'s date of birth is 2/2/01, which means that at the time of the dispositional hearing, K.G. was 12 ½ years old.

struggles. She stated that she is passionate about this case and has K.G.'s best interest in mind.

{¶34} Katherine Biddle, the assistant vice president of clinical services at Beechbrook, oversees all trauma-based therapies at Beechbrook. In this position, Ms. Biddle became familiar with K.G. and his parents. She testified that K.G. had become very connected to his therapist, Laurel Green, and was willing to reveal his concerns and feelings to her. She also testified that she is aware that K.G.'s struggle with trauma-based therapy continues due to his current living situation. Ms. Biddle stated that she believes that if K.G. remained in foster care, it would become more difficult for K.G. to progress because of the "insecure, uncertain" environment, where he would be "in a more defensive place, instead of being able to focus on resolving the problems that he has, particularly with his mother because that's what he identifies as being most upsetting for him." She also stated that if K.G. resided with his father, this therapy would continue for both parents.

{¶35} Ms. Biddle further testified that while she believes there is a possibility that K.G.'s relationship with his mother can be healed, K.G. cannot begin working on developing a more trusting relationship with his mother in his current unstable and insecure living situation. She testified that K.G. believes his mother is responsible for his being taken from his father and placed in foster care, which has made efforts to mend the relationship between K.G. and his mother difficult. Ms. Biddle testified that K.G.

"feels very secure in his relationship with his father" and the father is taking the situation seriously and doing everything he can to amend the situation. Ms. Biddle concluded that it would be in K.G.'s best interest for him to have a stable placement with his father, allowing the healing process between K.G. and his mother to continue.

{¶36} Finally, Arvella Fike, the ongoing CCDCFS worker for the family, testified that K.G. had been in the custody of CCDCFS for nearly one year and he was presently residing in a foster home. She stated that she developed a case plan in an attempt to achieve reunification with the father. As part of the plan, the father was required to take random urinalysis tests, which had all come back negative. Ms. Fike stated that the father has performed urine screens approximately every other week and sometimes twice per week and she has had no concerns regarding the urine screens. In addition, Ms. Fike stated that the reunification plan included therapy services for K.G., individually and with his mother. She testified that while K.G. "is in a very good foster home," she recommended that K.G. should be returned to the custody of his father with protective supervision to CCDCFS.

{¶37} At the end of the hearing, the father, CCDCFS, the guardian ad litem, and the child's attorney all requested that the court return K.G. to the custody of his father with protective supervision to CCDCFS.

{¶38} Despite the testimony outlined above, however, the court ordered K.G. into the temporary custody of CCDCFS and further ordered that the child's therapist, Laurel

Green, be replaced. We find the trial court's order is against the manifest weight of the evidence. The overwhelming evidence demonstrates that legal custody to the father with protective supervision is in K.G.'s best interest.

{¶39} Furthermore, the court's decision to replace K.G.'s therapist is also against the manifest weight of the evidence. In her decision to remove Ms. Green as K.G.'s therapist, the magistrate stated that she was "troubled" by Ms. Green's testimony that she "could not perform her function if I did not return the child to his father's custody." The record, however, does not support the magistrate's position.

{¶40} Ms. Green testified that she was not able to address K.G.'s post traumatic stress disorder that resulted from the abuse he suffered by his mother because K.G. had become increasingly distracted and anxious about his living situation and when he would be permitted to go home with his father. She testified that she had to change her treatment objectives in order to address this new anxiety, stating, "I've tried to continuously work on the issues that were first presented to me, but it's been very difficult for me to continue to help him in the healing process of the abuse from his mother * * *. It's been hard to address that because he's been very distracted" about his continued stay in foster care. This statement was made in the context of K.G.'s progression in therapy and his ability to heal from his abuse, not in regard to Ms. Green's inability to do her job. In fact, Ms. Green testified that it was in K.G.'s best interest to continue to the next level of therapy in a stable home environment. At no time in the

proceedings did Ms. Green testify that she could not perform her job if K.G. remained in foster care.

{¶41} Moreover, Ms. Green's supervisor, Ms. Biddle, supported Ms. Green's belief that it would become more difficult for K.G. to progress in foster care. She testified that K.G. has been open with his therapist, he has "connected" with her, and he has been willing to reveal his concerns and feelings to Ms. Green. Contrary to the court's decision, there is no evidence in the record demonstrating that replacing K.G.'s therapist is in his best interest.

{¶42} As such, based upon the evidence presented in this case, we conclude that the decision of the trial court to commit K.G. to the temporary custody of the agency and to replace K.G.'s therapist is against the manifest weight of the evidence. The overwhelming evidence supported an order of legal custody to the father with protective supervision.

{¶43} Judgment is reversed and remanded with instructions to the trial court to vacate its order of November 15, 2013, reinstate the child's therapist, and return the child to the legal custody of the father with protective supervision without delay.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile court division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
MELODY J. STEWART, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE ATTACHED OPINION)

MELODY J. STEWART, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶44} I agree with the majority decision to reverse this case. However, I would remand with instructions for the magistrate to issue findings of fact and conclusions of law forthwith, at which point objections may be filed and the trial court's decision reviewed.

{¶45} The trial court erred by approving and adopting the magistrate's decision before the magistrate issued findings of fact and conclusions of law. The purpose of separately stated findings of fact and conclusions of law is to enable the reviewing court to determine the existence of assigned error. *In re Adoption of Gibson*, 23 Ohio St.3d 170, 172-173, 492 N.E.2d 146 (1986); *In re Cunningham*, 4th Dist. Athens No. 03CA26, 2004-Ohio-787, ¶ 25. The magistrate's decision is barebones — it contains no findings of facts at all and is essentially unreviewable for questions concerning the weight of the evidence.

{¶46} The agency timely filed a request for findings of fact, and the magistrate apparently recognized her mandatory duty to issue those findings of fact when she granted the agency's request after the court had overruled the agency's objections to the magistrate's decision. Given this procedural posture, findings of fact and conclusions of law are necessary for a proper review of the court's judgment.