[Cite as *In re J.D.*, 2015-Ohio-4114.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: J.D., C.O. and D.O.

:
:
:     Appellate Case No. 26588
:
:     Trial Court Case Nos. 2013-2587
:                      2013-2588
:                      2013-2590
:
:     (Civil Appeal from Common Pleas
:     Court, Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of October, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by DYLAN G. SMEARCHECK, Atty. Reg. No. 0085249, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Appellee-Montgomery County Children Services

TYLER D. STARLINE, Atty. Reg. No. 0078552, 120 West Second Street, Suite 333, Dayton, Ohio 45402
      Attorney for Appellant-S.O.

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Mother, appeals from a decision terminating her parental rights with respect to her minor children, D.O., C.O., and J.D., and granting permanent custody of the children to Montgomery County Children Services ("MCCS").[1]  In support of her appeal, Mother contends that the permanent custody award is not supported by clear and convincing evidence that it is in the children's best interests.  Mother further contends that the factual grounds supporting the award are barred by res judicata, that the trial court erred by allowing MCCS to keep the children in custody for more than four years, and that trial counsel provided ineffective assistance of counsel.

{¶ 2} We conclude that the award of permanent custody to MCCS was supported by sufficient credible evidence.  We further conclude that the argument about res judicata has not been properly raised, since evidence pertaining to any prior proceedings is not part of the record before us.  In addition, Mother waived error in the conduct of the proceedings below, other than plain error, by failing to raise any objections in the trial court.  There was also no plain error.  Finally, trial counsel did not render ineffective assistance.  Counsel's decisions were a matter of trial strategy, and Mother's failure to comply with case plan requirements cannot be used in hindsight to judge her attorney's strategy.  Accordingly, the judgment of the trial court will be affirmed.

I.  Facts and Course of Proceedings

{¶ 3} On April 12, 2013, MCCS filed dependency complaints concerning Mother's

---

[1] For convenience, we will refer to the children's mother as "Mother," rather than using her initials.  For privacy purposes, the children will be identified only by their initials.

three minor children, D.O., C.O., and J.D. D.O. and C.O. were 11-year-old twins, and had been in foster care in either Ohio or Kansas for six of the 11 years. J.D. was eight years old, and had not been in his mother's custody for most of his life.

**{¶ 4}** The complaints alleged that the children were dependent under several grounds, including that they lacked adequate parental care based on their parent's or custodian's mental or physical condition; that their condition or environment was such to warrant the state in assuming their guardianship; and that they were residing in a household in which a parent, custodian, or guardian, or other member of the household had committed an act that was the basis for an adjudication that a sibling who resided in the household was an abused, neglected, or dependent child, and because of the circumstances surrounding the abuse, neglect or dependency of the sibling or other child and other conditions in the household, the child was in danger of being abused by the parent, custodian, guardian, or member of the household.

**{¶ 5}** The complaints made the following further allegations:

Montgomery County Department of Job and Family Services – Children Services Division (MCCS) believes this child is dependent based on a prior adjudication of dependency, mother's lack of stability, mother's relationships, mother's mental health, supervision concerns, possible permanent custody being taken of older children, Mother having previously spent time in prison for Abuse of Child (intentional torture), and because the children are in the custody of MCCS in a prior case but a permanent custody motion was denied and that custody expired. MCCS became involved with the family regarding a referral that J.D. was found outside of the home by

himself. Police were called and the child was returned to the home. Mother has previously resided in Kansas and was in an abusive relationship. Mother also spent time in prison from December 1997 until December 2000 for Abuse of a Child (intentional torture) out of Kansas. Mother has also reported that her parental rights have been terminated regarding four older children. After leaving Kansas, Mother moved to West Virginia to be with a man she met on the internet. Mother indicates that he became abusive with her and she fled the area. While there she sent all or [sic] her three children's hearing aids off to be repaired. She moved to Ohio prior to them being returned. All three children are legally deaf. Mother has been diagnosed with Major Depressive Disorder, Chronic, Severe, Without Psychotic Features; Dysthymic Disorder; Dependent Personality traits; and possibly Dependent Personality Disorder. Mother's current housing is not appropriate for the children. All three children were adjudicated dependent by this court in prior cases JC 2010-4491 (C.O.), 2010-4482 (D.O.), and 2010-40271 (J.D.). The parents have not completed their case plans in those cases and there are no willing, able and appropriate relatives with which to place the children. The children have been in the care of MCCS continually since November 17, 2010 because of the parent's failure to complete the case plan. The twins, now eleven, have been in foster care for approximately six years of their lives. The fathers are not involved.

Montgomery County Common Pleas, Juvenile Division Case No. JC 2013-2588, Doc.

#114, p. 1.[2]

**{¶ 6}** The complaints asked the court to adjudicate the children dependent and to grant a preferred disposition of permanent custody to MCCS pursuant to R.C. 2151.413; R.C. 2151.414(B)(1)(b) and (d) and (B)(2); and R.C. 2151.414(E)(1),(2),(4),(10),(14),(15), and (16). In addition, the complaints were accompanied by affidavits outlining essentially the same facts.

**{¶ 7}** On the same day, MCCS filed a motion and affidavit for interim temporary custody at an ex parte hearing. The court granted interim temporary custody, and a shelter care hearing was held a few days later. At that time, Mother and her attorney appeared and agreed to an interim order of custody. An adjudicatory and dispositional hearing was then set for June 4, 2013. *See* JC 2013-2588, Doc. #108. On April 18, 2013, amended dependency complaints containing the same allegations were filed, and on May 2, 2013, an amended order granting temporary custody to MCCS was filed, again noting that Mother had agreed to the interim order of custody. *Id.* at Doc. #101.

**{¶ 8}** On June 17, 2013, the Guardian ad Litem ("GAL") filed a report recommending that MCCS be granted permanent custody of the children. The GAL noted that Mother had been without permanent housing since December 2010, became friendly with strangers very quickly, and was willing to place herself and her children at risk by moving in with people of whom she had no real knowledge. Her newest roommate was a man she met on August 28, 2012 at a dentist's office. Mother was living in his home full-time a few weeks later. She paid no rent, had no contract or legal

---

[2] The pleadings in all three dependency cases are the same, and the proceedings were litigated together. As a result, for purposes of convenience, we will refer to the pleadings in one case (JC 2013-2588).

agreement, and paid no bills at the home. This individual, R.M., said he had no long-term plans for her to live in his home.

{¶ 9} According to the GAL, a psychological report indicated Mother did not currently have the capability to independently parent her children. Mother had completed a parenting class and a class at Artemis, as well as parenting-related classes and intervention in Kansas, but seemed unable to implement things she had learned. Mother had been told of the need for a mental evaluation in June 2010, but had not begun it until February 2012. She also had no permanent employment since arriving in Dayton, Ohio, in December 2009.

{¶ 10} The GAL's report also discussed Mother's prior incarceration in Kansas from 1997 to 2000 on four counts of Abuse of a Child (Intentional Torture). According to the GAL, "[w]hen asked about the abuse Mother denied it but she could not give any reason, or explanation, or any other suspected party for the charges. She seemed to not believe that there was any abuse, answering the questions about the abuse with, 'well they said.' " JC 2013-2588, Doc. #89, p. 4. The report also noted that the twins had previously been in foster care in Kansas from October 2005 through December 2008, and, therefore, had spent five of the last 11 years living with someone else. Further, J.D. had spent three years in his father's custody, and another 34 months in Ohio, which meant that most of his life had been spent in the custody of someone other than his mother. As to the fathers, the GAL had been unable to make contact with the twins' father, and J.D.'s father wanted to surrender his rights to J.D.

{¶ 11} An adjudicatory hearing was held before a magistrate on June 21, 2013. The magistrate then filed an entry shortly thereafter. The entry noted that Mother and

her attorney had appeared for the hearing. At that time, the parties agreed that dependency would be based only on the first sentence of the second paragraph of the complaints, which established dependency, and that the remainder of the complaint would be struck. *Id.* at Doc. #81, p. 1. The entry made the further statement that "[t]he mother was present at the hearing with her counsel. She did stipulate to the finding of dependency based upon the first sentence of the second paragraph of the complaints." *Id.* at pp. 1-2. No objections were filed to the magistrate's order, and no further appeal was taken.

**{¶ 12}** On September 6, 2013, MCCS filed a motion for a reasonable efforts bypass, based on the termination of Mother's parental rights in Kansas with respect to three siblings of D.O., C.O., and J.D. Attached to the motion as Exhibit 1 was a copy of a November 20, 1997 Memorandum Opinion and Journal Entry from the Juvenile Department of the District Court of Wyandotte County, Kansas. A certified copy of this journal entry was later admitted into evidence during the permanent custody hearing.

**{¶ 13}** The juvenile court opinion and entry involved the termination of parental rights to 10 minor children, who were living in a home with Mother and eight other adults who either lived in the home full time or visited frequently. Transcript of Proceedings, Vol. I, Ex. 1, p. 3. Among those children were three of Mother's children, L.O, R.O., and S.O., who were ages 6, 3, and 20 months old at the time of the termination. Mother had previously given custody of another daughter, L.G., to her father in 1995, when she was around two years old, due to suspected abuse. *Id.* at pp. 4-5.[3]

---

[3] Because this daughter's initials are also L.O., we will refer to this daughter by using the initial of her father's last name, which is "G."

{¶ 14} According to the opinion, Mother's first contact with the Kansas Social & Rehabilitation Services ("SRS") was in fall 1993, when her daughter, L.G., suffered a "rather severe head injury that was reported by the hospital as possible abuse." *Id.* at p. 2. At the time, L.G. was about six months old, and Mother's eldest child, L.O., was almost two years old. Mother was living with L.O.'s family. Based on prior experience with that family, SRS clearly explained to Mother that she needed to establish housing for herself and her daughters in order to ensure their safety. Mother agreed to place the daughters in emergency foster care while SRS helped her locate housing. *Id.*

{¶ 15} Although SRS found a home for Mother and her daughters and told Mother to keep her children away from L.O.'s family, Mother failed to maintain contact with SRS after moving in and abandoned the home about a month after she moved in. Because SRS could not locate Mother, the case was closed. *Id.*

{¶ 16} Mother's next contact with SRS was in February 1995, when she was again living with L.O.'s family. There was concern over possible abuse of L.G., and the fact that L.O. might be developmentally delayed. Mother was also spending her aid for the children on personal items, with little left for rent and child care. At that time, the situation was resolved by L.G.'s father taking custody of L.G.

{¶ 17} Subsequently, in April 1997, after receiving an anonymous complaint that L.O. was allegedly being physically abused by Mother, SRS went to the house to investigate. Mother and L.O.'s father, J.R., told the social worker that L.O. was not there and had been sent to California. Transcript of Proceedings, Vol. I, Ex. 1, p. 2. Based on information that L.O. was being hidden in the house, a search warrant was obtained, and the house was entered the following day. In this regard, the juvenile court noted

that:

> Upon entering the residence which was rented to [members of L.O.'s family,] the police found [L.O.] sitting on the floor in an upstairs hallway. She was very dirty, had a shaved head, bruises on her face, and her feet were so swollen that she could not stand. In addition, she had a black eye, scratches on her neck, a burn mark on her left front shin, a bruise in the middle of her back, swollen fingers on both hands and the area around her rectum and vagina were bright red. She was immediately taken to the Kansas University Medical Center for treatment and evaluation.

*Id.* at p. 2.

{¶ 18} The decision, which terminated Mother's rights to the three children in her custody, further stated that:

> In the present cases involving [Mother's] children [L.O.], age 6, [R.O.], age 3, and [S.O.], age 20 months, the evidence at trial was overwhelming that they are children in need of care.
>
> [Mother's] treatment of L.O. was appalling. In a statement to Det. J.B. Smith of the KCK Police Dept., she admitted handcuffing [L.O.] to the bed; shaking [L.O.] and shoving her to the floor; admitted [L.O.'s] feet were swollen and purple for three or four months, claimed not to know why and stated [other residents of the house] had also handcuffed [L.O.].
>
> [A resident of the house, L.R.,] related numerous instances of physical abuse of [L.O.] by [Mother]. She stated [L.O.] was tied up or handcuffed almost nightly. She further stated that [Mother] would bend

L.O.'s fingers backward and told of an incident in which [Mother] put [L.O.] behind a rocking chair on the front porch and then sat rocking it thereby forcing [L.O.'s] head to hit the wall behind her. In addition, [L.O.] would be forced to stand in a corner of the house for hours at a time during which she would not be allowed to use the bathroom, thereby urinating and defacating [sic] on herself. [L.R.] heard [Mother] state in reference to [L.O.], "I can't stand that little bitch, I wish she was dead" and in reference to all her children that she had kids too young and wanted to get rid of them.

Transcript of Proceedings, Vol. I, Ex. 1, p. 5.

{¶ 19} Other residents of the house testified in detail about the abuse that Mother inflicted on all the children. They stated that in addition to the abuse of L.O., Mother locked R.O. in an upstairs room to punish him and keep him out of her way, and had hit him with a board. Other residents of the house also abused L.O. After considering the evidence, which included medical documentation of the injuries to the children, the juvenile court concluded that the evidence overwhelmingly justified termination of Mother's parental rights. In this regard, the court observed that:

Mother's attitude toward her children evidences a complete and callous disregard of her duties as a parent. This Court would consider any attempt to reintegrate children with such a mother to be an act bordering on criminal negligence. To say reintegration is not a viable alternative in this case is a gross understatement of the heinous, reprehensible and patently criminal conduct of Mother.

*Id.* at p. 9.

{¶ 20} On September 25, 2013, the GAL filed an updated report, again recommending that MCCS receive permanent custody of the children. The GAL noted that Mother was bonded to the children, but had become completely overwhelmed by them. The youngest child, J.D., had spent most of a week in August 2010 at the Kettering Behavioral Center as an inpatient in an attempt to obtain a diagnosis of some of his behavioral problems. JC 2013-2588, Doc. #72, p. 3. In the report, the GAL noted that:

> Mother has previously shown little initiative to get and/or follow through with obtaining help for her or the Children's needs. Having no social support, the Mother has looked to the internet or casual meetings for friends and boyfriends. The men become the Children's primary disciplinarians. Upon leaving [J.D.] at the Kettering Behavioral Center Mother stated to G.A.L. "These boys don't want to see me happy; they ruin every relationship I have."

*Id.* at p. 3.

{¶ 21} The report further noted that Mother had received no therapy either while incarcerated for L.O.'s Child Abuse (Intentional Torture) from 1997 to 2000, or after she was released from incarceration. *Id.* at p. 10.[4] After sporadic therapy between 2010 and 2013, Mother began therapy at Solutions Community Counseling and Recovery

---

[4] According to the evidence presented at the permanent custody hearing, Mother was sentenced to 32 months in prison on December 18, 1997, and was given 233 days of jail credit, which represented the time that had elapsed since April 30, 1997. See Transcript of Proceedings, Vol. I, Ex. 2, p. 4. Mother was sentenced to 32 months on each of four charges of child abuse, with the terms imposed concurrent to each other. Id. at pp. 1-3.

("Solutions") in January 2013 and had been regularly attending biweekly since that time. Concerning her therapy, Mother stated that "I have to go so I go." *Id.* In addition, the GAL noted that Mother had made no progress on obtaining permanent housing and continued to rely on gentlemen friends for housing and transportation. Mother did regularly visit the children for two hours per week, and was temporarily employed at her counselor's office doing janitorial work as of August 26, 2013. The GAL still had not been able to contact the twins' father, and had not been able to find other relatives who could take custody of the children.

{¶ 22} On October 16, 2013, the magistrate filed a decision and order of temporary custody concerning a dispositional hearing and motion for reasonable efforts bypass that was held on October 3, 2013. Both Mother and her attorney appeared for the hearing. The magistrate granted the motion for reasonable bypass based on the grant of permanent custody in Kansas with respect to Mother's three children. The magistrate noted that "[t]he parties do not contest the Agency's motion." JC 2013-2588, Doc. #67, p. 1.

{¶ 23} The magistrate further found that Mother was engaged in services but her case plan was not complete and she did not have the current ability to care for the children. The magistrate, therefore terminated the former interim custody order and granted temporary custody to MCCS. The magistrate additionally stated that "all parties are in agreement with a grant of temporary custody to Montgomery County Children Services." *Id.* at p. 2. The trial judge immediately signed the order, and the parties were notified that they had 14 days to object to the decision. No objections were filed.

{¶ 24} On October 21, 2013, MCCS filed a motion for permanent custody, claiming

that an order of permanent custody was in the children's best interests. In early December 2013, the GAL filed an updated report and recommendation. Among other things, the GAL indicated that Mother had continued to discuss court dealings with the children, even though she had been asked not to do so, and this contributed greatly to the children's struggles. The GAL also stated that Mother still did not have appropriate housing and worked part-time, bringing home about $40 per week. The GAL again recommended that MCCS receive permanent custody, based on Mother's "history, mental health status and lack of initiative and/or ability to meet the needs" of the children. JC 2013-2588, Doc. #61, p. 4.

{¶ 25} Hearings on the permanent custody motion were scheduled for January 23 and 24, 2014. On January 16, 2014, the GAL filed another report and recommendation. The GAL noted that one of the twins had reported that his mother allowed her paramour to spank them many times and had him turn the handle on the bedroom door around so they could not lock the door "when [Mother] got mad and came after us." JC 2013-2588, Doc. #40, p. 2. The other twin also told the GAL that Mother had allowed male friends to spank them, but "it's OK because we deserved it." *Id.* at p. 3. The GAL commented that the twins were bonded with Mother, but could not self-protect at this age. In addition, the GAL noted that the Mother had promised the children cell phones, video games, and bicycles when they were returned to her care. *Id.* at p. 4. The GAL also listed various comments by Mother to the children about the fact that MCCS and the GAL were lying about Mother because they did not want the children to live with her, and that the children would be living with her very soon. *Id.* at p. 5. At one point, the children said goodbye to friends because their mother was going to court and had said the children were going

home. *Id.* Again, Mother had been asked not to discuss court proceedings with the children, and these comments were having a detrimental effect on the children.

{¶ 26} The GAL additionally noted that a home study had been done of the home where Mother currently resided, and it did not pass. *Id.* at p. 4. Despite having been given information and referrals for housing between 2010 and the spring of 2013, Mother did not effectively follow up, but waited for a case manager from Solutions to help her in September 2013. *Id.* at p. 6. An updated psychological evaluation indicated that Mother had demonstrated improvement in her depression and parenting knowledge, but "significant concerns remain regarding her ability to independently provide for herself and her children and her willingness to rely on others – at times, to rely on strangers – for housing, transportation and to place herself and her children in potentially risky situations in order for their basic needs to be met." *Id.* at p. 7. All the children's therapists had rejected family counseling unless it was a certainty that the children were going home. *Id.* at p.11.

{¶ 27} With respect to Mother, her therapist provided reports to the GAL. In this regard, the GAL observed that:

Several times, most recent dated 8/30/2013[,] these reports indicate Mother's insight and judgment are limited. Including on the Mental Status Exam done on 1/7/13 under Insight/Judgment it states, "Client appears to have limited insight into why two different sets of children had been taken out of her care and placed in foster care. Although she can explain what happened, she is not aware of any role she had in this happening. Client appears to have poor judgment in who she chooses to live with and who

has contact with her children."

JC 2013-2588, Doc. #40, p. 11.

**{¶ 28}** Once again, the GAL recommended that MCCS be granted permanent custody. However, the permanent custody hearings were not held in January 2014, but were continued until May 29 and 30, 2014, due to Mother's need to review additional discovery that MCCS had provided.

**{¶ 29}** In late March 2014, Mother filed an amended motion for increased visitation and family therapy, based on an evaluation previously performed by Dr. Julia King in September 2013. The GAL filed another report and recommendation on May 22, 2014, reiterating many of the facts that have already been discussed. In addition, the GAL mentioned that Mother's visits had been increased to twice a week in May 2014. Again, Mother continued to inappropriately discuss court matters and visitation with the children, causing disruption. The GAL commented that the children's therapists had stated that additional visitation would be detrimental unless the family was to be reunited. As an additional matter, the GAL stated that Mother had just gotten on a waiting list for housing, although the need to do so had been known since 2010. On May 23, 2014, the GAL filed a motion to suspend the increased visitation because it was not in the children's best interests.

**{¶ 30}** On May 29, 2014, the permanent custody matter came before the court, but was continued until September 11, 12, and 15, 2014. The continuance was based on a conflict that had developed between D.C., the father of D.O. and C.O., and his attorney, which caused the attorney to ask to withdraw from the case.

**{¶ 31}** During the summer of 2014, Mother visited the children once a week for four

hours. Although the increased visitation had been scheduled for two hours twice a week, Mother had transportation problems and could only come once a week. At the end of the summer, visits were decreased to two hours, because the children were back in school and could not attend a four-hour visit.

{¶ 32} On September 4, 2014, the GAL filed a report and recommendation. At that time, the GAL indicated that she had last seen the children on August 26, 2014. The GAL noted that all three boys were hearing-impaired, and the youngest, J.D., also had learning, cognitive, and behavioral issues. Although J.D. was nine years old, he functioned scarcely above a preschool level in some areas, and his behavior required "constant supervision and an enormous amount of patience." JC 2013-2588, Doc. #18, p. 3.

{¶ 33} The GAL had been with the case since it was opened in February 2010. She noted that Mother's paramour stayed in the apartment until May 2010, and Mother and the paramour had both asked if there was a way to lock the refrigerator because the boys were eating too much. In May 2010, Mother introduced the GAL to another man who was new to the area and whom the children were calling "Daddy." This is the man who had used a belt on D.O. *Id.* at p. 5.

{¶ 34} As before, the GAL commented that Mother had been without permanent/appropriate housing since December 2010. From January 2011 until September 2012, Mother stayed in several places with relative strangers. She met her most recent roommate in late August 2012 at a dentist's office and a few weeks later was living in his home. *Id.* at p. 5. Mother had made minimal efforts to obtain housing, and was not on a waiting list for Metropolitan Housing in Warren County until March 2014.

She had also applied for Section 8 housing in August 2014. *Id.*

{¶ 35} The GAL noted that Mother's job was discontinued in the spring of 2014, and that mother had not contacted her vocational counselor since she lost that job. *Id.* at p. 8. In addition, the GAL stated that Mother had a new therapist, but the GAL was not able to speak to the therapist because Mother did not sign a release. *Id.* at p. 1. Mother also had gone to therapy 28 out of 40 months, with lapses in treatment. According to the GAL, Mother had said "she would stop going because she felt no connection to the therapist and this is what she is saying about her most recent therapist." *Id.* at p. 14. After discussing these facts as well as others that have been previously mentioned, the GAL again recommended that MCCS be granted permanent custody of the children.

{¶ 36} The hearings on the motion for permanent custody took place on September 15, 2014, October 29, 2014, and December 5, 2014. During the hearings, the trial judge (not the magistrate) heard testimony from the following individuals: the GAL; Dr. Julia King, a clinical psychologist who had performed psychological examinations of Mother in April 2011 and August 2013; the foster father for the twins; the caseworker who had been assigned to the case since April 2013; Mother's most recent counselor from Solutions, who had met with her on two occasions; and a property manager from Warren Metropolitan Housing Agency. Mother did not testify, and the children's fathers did not appear for the hearings, although they were represented by counsel. The trial judge also conducted an in camera interview with the children.

{¶ 37} After hearing the evidence, the court filed a decision on January 27, 2015, granting permanent custody to MCCS. In its decision, the court concluded that there

was clear and convincing evidence in accordance with R.C. 2151.414(E) that the children could not or would not be placed with either parent within a reasonable period of time, and there was also clear and convincing evidence under R.C. 2151.414(D) that the children's commitment to MCCS's permanent custody was in their best interests. Mother timely appealed the decision of the trial court.

## II. Best Interests of the Children

{¶ 38} Mother's First Assignment of Error states that:

The Juvenile Court Prejudicially Erred by Granting Permanent Custody of the Children to Montgomery County Children Services Because the Evidence Was Not Clear and Convincing that Permanent Custody Was in the Children's Best Interests.

{¶ 39} Under this assignment of error, Mother contends that the trial court erred in concluding that the evidence was clear and convincing, because MCCS caseworkers lacked credibility in 2010 and 2013 cases involving Mother and these children. Mother also contends that she presented testimony that she had made substantial progress on her case plan objective, that she was in a position to safely and appropriately reunify with her children, that she was bonded with her children, and that the children wished to return to her custody.

{¶ 40} Before addressing these arguments, we note that Mother has attempted to add material to the record that was not part of the trial court record. The added material is an April 11, 2013 Magistrate's Decision and Judge's Order in Montgomery County Juvenile Court Cases JC 2010-4481, JC 2010-4482, and JC 2010-10271. Mother has

attached the order to her brief as an "App.R. 16(E) Addendum."

{¶ 41} We have repeatedly stressed that we will not permit materials to be added to the record, and then decide the case based on evidence that was not before the trial court. *See, e.g.*, *State v. Bellamy*, 181 Ohio App.3d 210, 2009-Ohio-888, 908 N.E.2d 522, ¶ 21 (2d Dist.), citing *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus*; Bell v. Bell*, 2d Dist. Clark No. 2007 CA 9, 2007-Ohio-6347, ¶ 14-19, also citing *Ishmail*.

{¶ 42} It is also well established that "a court may not take judicial notice of prior proceedings in the court, but may only take judicial notice of the proceedings in the immediate case." *Diversified Mortg. Investors, Inc. v. Athens Cty. Bd. of Revision*, 7 Ohio App.3d 157, 159, 454 N.E.2d 1330 (4th Dist.1982). *Accord Davis v. Haas*, 2d Dist. Montgomery No. 24506, 2011-Ohio-5201, ¶ 19; *Davenport v. Big Bros. & Big Sisters of Greater Miami Valley, Inc.*, 2d Dist. Montgomery No. 23659, 2010-Ohio-2503, ¶ 24 (court "may not take judicial notice of prior proceedings in another case, * * * even one involving the same parties and subject matter.") " 'The rationale for these holdings is that when judicial notice is taken of prior proceedings, such prior proceedings are not part of the record as defined in App.R. 9, and whether the trial court correctly interpreted such prior proceedings is not reviewable by the appellate court.' " *State ex rel. Everhart v. McIntosh*, 115 Ohio St.3d 195, 2007-Ohio-4798, 874 N.E.2d 516, ¶ 7, quoting *Phillips v. Rayburn*, 113 Ohio App.3d 374, 379, 680 N.E.2d 1279, (4th Dist.1996), fn. 1.

{¶ 43} Mother has attempted to circumvent these cases by using App.R. 16(E), which states that: "Parties are discouraged from attaching to briefs any legal authority generally accessible through online legal research databases. If determination of the

assignments of error presented requires the consideration of legal authority not accessible through any online resource, the relevant parts shall be reproduced in the brief or in an addendum at the end or may be supplied to the court in pamphlet form."

{¶ 44} This comment in App.R. 16(E) is not an exception to the cases cited above. App.R.16(E) discourages parties from attaching legal authority to their briefs that is accessible online, but allows attachment when access to such authority is not available. The rule applies to legal citations and is intended to reduce unnecessary attachment of items to briefs; it is not designed to let parties attach pleadings and evidence to their briefs that were not part of the trial court record and that appellate courts may not otherwise consider. Accordingly, we will not consider the attachment to Mother's brief, nor will we consider any arguments related to prior proceedings involving the parties.

{¶ 45} Turning to Mother's argument about the evidence in this case, we note that the agency filed a motion for reasonable efforts bypass under R.C. 2151.419(A)(2) on September 6, 2013, because Mother's parental rights to three siblings of the children had been terminated in Kansas in 1997. The motion was granted about a month later, and the magistrate specifically noted that Mother did not contest the motion. JC 2013-2588, Doc.# 67, p.1. The trial court adopted this decision the same day, and Mother did not file objections to the magistrate's decision. MCCS subsequently filed the motion for permanent custody pursuant to R.C. 2151.413; R.C. 2151.414(B)(1)(b) and (d), (B)(2), and (D)(1) and (2); and R.C. 2151.414(E)(1),(2), (4), (7)(c), (8), (10), (11), (14), (15), and (16).

{¶ 46} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re K.W.*, 185 Ohio App.3d 629,

2010-Ohio-29, 925 N.E.2d 181, ¶ 15 (2d Dist.), citing R.C. 2151.414(E) and *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. "However, the court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.* "We review the trial court's judgment for an abuse of discretion." *Id.,* citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

{¶ 47} "Clear and convincing evidence is that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. In this regard, '[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 48} Because the trial court made a reasonable efforts bypass determination under R.C. 2151.419(A)(2), this case is governed by R.C. 2151.413(D)(2) and R.C. 2151.414(B)(2). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 17. R.C. 2151.413(D)(2) provides that:

Except as provided in division (D)(3) of this section, if a court makes a determination pursuant to division (A)(2) of section 2151.419 of the Revised Code, the public children services agency or private child placing agency required to develop the permanency plan for the child under division (K) of section 2151.417 of the Revised Code shall file a motion in the court that made the determination requesting permanent custody of the child.

{¶ 49} Thus, once the reasonable efforts bypass determination is made, the agency is required to file a motion for permanent custody. R.C. 2151.414(B)(2) further provides that:

With respect to a motion made pursuant to division (D)(2) of section 2151.413 of the Revised Code, the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.

{¶ 50} R.C. 2151.414(E) contains 16 factors to be considered with respect to whether the children can be placed with the parents within a reasonable time or should be placed with the parents. Based on the trial court's findings, the applicable factors are R.C. 2151.414(E)(1),(4), (7)(c),and (11), which provide that:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a

reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an

adequate permanent home for the child;

* * *

(7) The parent has been convicted of or pleaded guilty to one of the following:

(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 51} Although only one factor is required, several factors applied in the case before us, and they were supported by competent, credible evidence.

{¶ 52} In determining the best interests of the child, "R.C. 2151.414(D) directs the trial court to consider all relevant factors * * * including but not limited to '(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster

caregivers, * * * and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child, * * *; [and](4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.' " *K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, at ¶ 20.

{¶ 53} In asserting that the trial court's decision was not supported by clear and convincing evidence, Mother contends, first, that the testimony of the MCCS caseworkers lacked credibility in the 2010 and 2013 cases. As was noted, we will not consider argument that depends on prior pleadings that are not part of the record.

{¶ 54} Concerning the 2013 case, Mother focuses on testimony of the MCCS caseworker, who admitted to inaccuracies in information in the affidavit that was filed in support of the 2013 permanent custody motion. In particular, the affidavit indicated that Mother had been incarcerated for six years in Kansas, when her prison term was actually three years; and that Mother failed to complete an Artemis program, when Mother had, in fact, completed the program.

{¶ 55} As a preliminary matter, we note that the trial court was informed in pleadings filed at the beginning of the case that Mother's prison term in Kansas lasted from 1997 to 2000. *See* JC 2013-2588, Doc # 114, p. 1 (Dependency Complaint), and Doc. #107, p. 1 (Amended Dependency Complaint). These pleadings were filed months before the permanent custody motion was filed.

{¶ 56} The GAL and MCCS caseworker also both testified during the custody hearings that Mother's prison term was three years, and the sentencing entry was

admitted into evidence at the hearing. As a result, the trial court would not have been confused or misled about the facts. The caseworker also testified that she did not recall saying in her affidavit that Mother's prison term was six years. Transcript of Proceedings, Vol. II, p. 172. The court was in the best position to assess witness credibility.

{¶ 57} The same observations are true regarding Mother's participation in the Artemis program. Before the MCCS caseworker testified, the GAL had already testified that Mother had completed the Artemis program. Transcript of Proceedings, Vol. I, p. 125. Moreover, concerning Artemis, the caseworker testified that Mother had completed this program before the caseworker was assigned to the case. Transcript of Proceedings, Vol. II, p. 174. While this does not excuse any lack or care in filing affidavits or pleadings, we stress again that the trial court was in the best position to assess credibility and decide what testimony to credit. There was ample testimony to support the trial court's findings.

{¶ 58} In particular, Mother knew for several years that she needed to obtain independent and stable housing as part of the case plan. She also knew early in 2013 that the home where she currently resided did not pass a home study. Yet, Mother did not obtain a one-bedroom apartment until October 30, 2014. This was after trial began, and the apartment still was not adequate for the children. As the trial court noted, there was no guarantee with respect to how long it might take Mother to obtain suitable housing for herself and the children.

{¶ 59} Furthermore, as the trial court also observed, Mother never demonstrated an ability to independently provide for herself or for the children's basic needs. During

the time that MCCS was involved with Mother and the children, from February 2009, until permanent custody was granted in January 2015, Mother's only employment was a part-time job, bringing home about $40 per week, and this job only lasted from August 2013 until May 2014. Although income was not the primary concern, it was a concern. Another concern was Mother's reliance on others and the risk that posed to the children. Again, this dependence on others did not change from the beginning of the case to the end. A further concern was Mother's history of involvement with children services agencies dating back to 1993, persisting throughout the time Mother was in Kansas, and continuing only a few months after she arrived in Dayton, when her young child was found wandering in the street alone in January 2010.

{¶ 60} More troubling yet is Mother's denial of any role in the appalling abuse perpetrated on L.O. The record indicates that Mother attended counseling only because the court required her to do so, and that she was untruthful with the GAL and Dr. King, denying the abuse or any part in the abuse throughout the entirety of the case. *See, e.g.*, Transcript of Proceedings, Vol. I, pp. 67 and 85; Vol. II, pp. 31, 39, and 87. There is no indication that issues leading to the abuse have ever been addressed in therapy or counseling. Although there was testimony that Mother and the twins had bonded, and that the twins, at least, wished to remain with their mother, the trial court was in the best position to weigh these factors, and to conclude that the children's need for stability – which the Mother could not provide – was best served by a grant of permanent custody to MCCS. We note that Mother repeatedly disregarded instructions not to discuss the case with the children and also improperly attempted to influence the children. These actions were detrimental to the children's welfare and stability and show poor insight and

judgment.

{¶ 61} Mother stresses the fundamental interest of parents in the care and custody of their children. While this is true, "[t]he fundamental interest of parents is not absolute * * *. Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11.

{¶ 62} In *K.W.*, we noted that:

R.C. 2151.419(A)(2) establishes objective factors that alleviate the general requirement, set forth in R.C. 2151.219(A)(1), that an agency attempt to reunify a child with his or her parents before seeking permanent custody. The prior involuntary removal of a child from the parents' custody is one of these factors. R.C. 2151.419(A)(2)(e). The court is also required to consider the prior involuntary termination of parental rights in determining whether a child can or should be placed with a parent within a reasonable period of time. R.C. 2151.414(E)(11). This factor is rationally related to the need for and likely success of reunification efforts. *In re Baby Girl Elliott*, Butler App. No. CA2003–10–256, 2004-Ohio-3539, at ¶ 49–51 ("The circumstances surrounding a prior termination of a parent's parental rights are highly relevant in a hearing to terminate the rights of the same parent regarding another child"). Pursuant to R.C. 2151.414(E)(11), the parent who has had parental rights involuntarily terminated may prove, by clear and convincing evidence, that the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child, notwithstanding the prior termination. The legislature's

concern for children who are born to parents who have had other children involuntarily removed from their custody is understandable and justified.

*K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, at ¶ 28. We agree with these comments and find they apply to the case before us. There is no clear and convincing indication that Mother can provide a legally secure permanent placement for the children, and significantly less evidence that she can adequately protect their health, welfare, and safety. We did stress in *K.W.* that "[t]he state is nonetheless required to prove, by clear and convincing evidence, that granting permanent custody to the agency is in the best interest of the child." *Id.* at ¶ 20, citing R.C. 2151.414(B)(1)(a). As was noted, the record contains sufficient credible evidence supporting the trial court's decision.

{¶ 63} Based on the above discussion, we conclude that the trial court did not err in concluding that a grant of permanent custody to MCCS was in the best interests of the children. Accordingly, the First Assignment of Error is overruled.


### III. Res Judicata

{¶ 64} Mother's Second Assignment of Error states that:

The Juvenile Court Prejudicially Erred by Granting Permanent Custody of the Children to Montgomery County Children Services Because the Factual Grounds that Formed the Basis for the Permanent Custody Filings are Barred by Res Judicata.

{¶ 65} Under this assignment of error, Mother contends that this proceeding is barred by res judicata because the decision in the 2010 proceeding was not appealed

and should have operated to bar the current proceeding. The State contends that res judicata does not prohibit ongoing litigation of custody issues.

{¶ 66} In support of her argument, Mother cites the case of *In re A.S.*, 3d Dist. Allen Nos. 1-12-01, 1-12-02, 2012-Ohio-3197, ¶ 53, which applied the doctrine of res judicata to preclude a mother from challenging an adjudication of dependency, where she failed to object to a magistrate's decision and failed to appeal from the adjudication judgment. *Id.* at ¶ 53. In a similar situation in *K.W.*, we did not apply res judicata, but concluded that a mother's argument about error in a dependency finding and in awarding temporary custody to the agency was untimely because the dependency finding was a final, appealable order, and the mother failed to appeal from the dependency judgment. *K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, at ¶ 17. Among the cases we cited was *In re Adams*, 115 Ohio St.3d 86, 2007-Ohio-4840, 873 N.E.2d 886. *Id.*

{¶ 67} In *Adams*, the Supreme Court of Ohio considered "whether a children-services agency may appeal a trial court's order denying the agency's motion to modify temporary custody to permanent custody and continuing temporary custody." *Id.* at ¶ 4. The court concluded that the order was not a final, appealable order. Specifically, the denial did not determine the action because the parties were subject to further court order. *Id.* at ¶ 36. The Supreme Court of Ohio also noted that "[a] denial of permanent custody and a continuation of temporary custody do not prevent a children-services agency from seeking any applicable dispositional order, or even renewing a request for permanent custody." *Id.* at ¶ 37. The court distinguished this from situations like the one involved in the case of *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). In *Murray*, an order granting temporary custody to an agency was held to be a final, appealable order,

in part because R.C. 2151.414(A) precluded readjudication of such orders at the custody hearing. *Adams* at ¶ 38.

As the State notes in its brief, courts have also held that "principles of res judicata do not apply to decisions in dispositional hearings because the court retains continuing jurisdiction." *In re K.G.*, 8th Dist. Cuyahoga Nos. 100782, 100843, 2014-Ohio-3461, ¶ 18, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007–Ohio–827, ¶ 24, and *In re Ament*, 142 Ohio App.3d 302, 310, 755 N.E.2d 448 (12th Dist.2001). In *K.G.*, the court of appeals stated that "[b]ecause of this continuing jurisdiction, res judicata will not prohibit the court from revisiting issues that are relevant to a motion for custody – legal or permanent – even if the same or similar issues may have been considered in a prior action falling within the purview of R.C. Chapter 2151." *Id.*

**{¶ 68}** Under *Adams*, a prior order denying permanent custody to the agency in 2010 would not have been a final, appealable order, and further dispositions, including an order of permanent custody, would have been permitted. However, we need not further discuss or resolve this matter because none of the proceedings in the prior case are part of the record. Accordingly, the Second Assignment of Error is overruled.

IV. Error in the Temporary Custody Proceedings

**{¶ 69}** Mother's Third Assignment of Error states that:

The Juvenile Court Prejudicially Erred by Allowing Montgomery County Children Services to Effectively Keep the Children in Temporary Custody for Over Four Years.

**{¶ 70}** Under this assignment of error, Mother contends that the trial court erred in

allowing the children to stay in temporary custody in the 2013 case because the children ended up being in custody for over four years. According to Mother, continuing with the 2013 case allowed MCCS to receive extra extensions of temporary custody to which it would not have been entitled.

{¶ 71} As we have stressed, the pleadings in any prior cases are not properly before us, and we cannot consider error that is predicated on their existence. As a result, we reject Mother's alleged error because it is based on evidence that is not in the record.

{¶ 72} Assuming for the sake of argument that we could address this matter, Mother waived the issue by failing to object during the trial court proceedings. In this regard, we note that after this case was filed on April 12, 2013: (1) Mother agreed to an order of interim temporary custody to MCCS on April 15, 2013; (2) Mother agreed to an amended order of interim temporary custody on May 2, 2013; (3) Mother stipulated to a finding of dependency at the adjudication hearing held by a magistrate on June 21, 2013, and did not thereafter either file objections or appeal from the decision; and (4) Mother agreed to give MCCS temporary custody at the dispositional hearing and did not contest MCCS's motion for bypass, both of which were heard by a magistrate on October 3, 2013. Mother did not thereafter either file objections to the magistrate's order or appeal. *See* Doc. #108, p. 1; Doc. #101, p. 1; Doc. #81, p. 1-2; and Doc. #67, p.1-2.

{¶ 73} At no time did Mother challenge the proceedings in the trial court, and we conclude that she has waived any objections, other than plain error. *See, e.g.*, *In re C.B.*, 2d Dist. Montgomery Nos. 24564, 24565, 24566, 2011-Ohio-4537, ¶ 9; *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 15.

{¶ 74} In *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), the

Supreme Court of Ohio held that "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* at syllabus. We do not consider this such a case.

{¶ 75} If Mother felt MCCS had improperly pursued custody, she had ample opportunity to bring it to the trial court's attention. Mother was represented by counsel at all points. Instead of bringing the alleged error to the trial court's attention, she said nothing during nearly two years while the proceedings were pending and significant amounts of time were consumed. It would be an inappropriate use of the judicial process to let parties profit by their delay in challenging trial court actions, particularly where, as here, the party who fails to object is made aware during the proceedings that her children need stability and that uncertainty in resolving the custody issue is detrimental to the children's welfare.

{¶ 76} Accordingly, the Third Assignment of Error is overruled.

IV. Ineffective Assistance of Counsel

{¶ 77} Mother's Fourth Assignment of Error states that:

Trial Counsel Prejudicially Provided Ineffective Assistance to Appellant Mother if Any of the Errors Are Deemed Invalid.

{¶ 78} Under this assignment of error, Mother contends that if we fail to find reversible error in the other assignments of error, then trial counsel was prejudicially

ineffective by failing to object during the trial court proceedings.

**{¶ 79}** We have previously held that "both R.C. 2151.352 and Juv.R. 4 establish a parent's right to counsel in termination proceedings." (Citation omitted.) *In re S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, ¶ 8. "A parent's right to counsel arises from the guarantees of due process and equal protection contained in the constitutions of Ohio and the United States." *Id.*, citing *State ex rel. Heller v. Miller,* 61 Ohio St.2d 6, 399 N.E.2d 66 (1980), paragraph two of the syllabus. "That right to counsel includes the right to the effective assistance of trial counsel. The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking the permanent, involuntary termination of parental custody." (Citations omitted.) *Id.*

**{¶ 80}** In *S.A.*, we further noted that:

In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. *Id.* The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. *Id.* Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time. *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70.

Even assuming that counsel's performance was ineffective, the

defendant must still show that the error had an effect on the judgment. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding likely would have been different. *Id.*

*S.A.* at ¶ 9-10.

**{¶ 81}** "Generally, counsel's performance falls below the norm if he fails to advocate the defendant's cause, fails to keep the defendant informed of important developments, or fails to use the requisite level of skill necessary to ensure the integrity of the adversarial proceedings." *State v. Peeples*, 94 Ohio App.3d 34, 45, 640 N.E.2d 208 (4th Dist.1994).

**{¶ 82}** We have found the possibility of ineffective assistance of counsel in situations where trial counsel failed to contact a parent to discuss the case, failed to notify the parent of court dates, or failed to take steps to meaningfully preserve an incarcerated parent's right to participation. *See In re P.M.*, 179 Ohio App.3d 413, 2008-Ohio-6041, 902 N.E.2d 74, ¶ 18 (2d Dist.) (remanding for hearing on whether father had ineffective assistance of counsel when father alleged in objections to magistrate's decision that counsel had failed to contact him to discuss the case or to notify him of court dates.); *S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, at ¶ 9-15 (trial counsel was ineffective by failing to protect incarcerated mother's right to participate in permanent custody hearing).

**{¶ 83}** In the case before us, we see no evidence that counsel's performance was defective. "To justify a finding of ineffective assistance of counsel, the appellant must

overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Strickland* at 689.

{¶ 84} While the case was pending, and even after reasonable efforts bypass was granted, MCCS continued to assist mother and to offer services under the case plan. The GAL, who was closely involved with Mother and the children from the beginning, indicated that she had noticed a change in Mother when she began counseling at Solutions in 2013, and that for a while, Mother was doing really well. The GAL stated that she was really hopeful. This is consistent with Dr. King's evaluation of Mother in August 2013, when Dr. King concluded that Mother's depression had improved. However, for about seven to nine months before the permanent custody hearing in September 2014, the GAL had observed Mother going back into a depression and having low energy, patience, and interaction with the children.

{¶ 85} The caseworker who was assigned to the case in April 2013 indicated that she went over the case plan objectives with Mother every time she saw her, and that the objectives remained the same throughout: to obtain housing and income that were stable to provide for the children's basic needs; to complete the parenting/psychological assessment and follow all recommendations; to sign all authorizations, and to obtain mental health counseling and follow all recommendations. After the home where Mother was living failed to pass inspection, the caseworker gave Mother referrals for housing.

{¶ 86} It is true that MCCS sought reasonable efforts bypass in September 2013 and that Mother did not contest it. However, we cannot say trial counsel's strategy was unsound, since at the time, Mother was employed, was regularly engaging in counseling,

and was receiving services. Furthermore, Mother would have gained nothing at that point from challenging the motion, since her parental rights had admittedly been terminated with respect to three other children. This is a ground for reasonable efforts bypass under R.C. 2151.419(D)(2)(e), and where such grounds exist, the statute requires the trial court to determine that the agency is not required to make reasonable efforts. As we observed in *K.W.*, in this situation, the parent may still prove, "by clear and convincing evidence, that the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child, notwithstanding the prior termination." *K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, at ¶ 28. Thus, while Mother had a burden, she still had an opportunity to prove that she could adequately care for her children.

{¶ 87} At the time of the reasonable efforts bypass, however, Mother did not have the current ability to care for the children, since she lacked appropriate housing and lacked stability. As a result, leaving the children in the care of MCCS and continuing to work toward this goal was a reasonable strategy. The fact that Mother never successfully completed her case plan requirements does not mean that trial counsel's approach was defective. As we have stressed, "[h]indsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time." *S.A.*, 2d Dist. Clark No. 07-CA-110, 2008-Ohio-2225, at ¶ 8.

{¶ 88} There is no indication that trial counsel's representation of Mother was anything other than vigorous during this case, or that the proceedings were other than adversarial. Accordingly, since trial counsel did not render ineffective assistance of counsel, Mother's Fourth Assignment of Error is overruled.

## VI.   Conclusion

**{¶ 89}** All of Mother's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Dylan G. Smearcheck
Tyler D. Starline
Adam Krumholz
Stephanie Allen
Cristy Oakes
Richard Lipowicz
Marshall Lachman
Hon. Nick Kuntz